B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Eventide Credit Acquisitions, LLC | Big Picture Loans, LLC |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Forshey&Prostok, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, TX 76102<br>817-877-8855 | Toby Gerber<br>Norton Rose Fulbright US LLP<br>2200 Ross Ave. Suite 3600<br>Dallas, TX 75201 |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Default under promissory note; turnover of money and information.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 27,000,000 |

**Other Relief Sought**
Turnover of information

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Eventide Credit Acquisitions, LLC | BANKRUPTCY CASE NO.<br>23-90007-mxm11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Fort Worth | NAME OF JUDGE<br>Mullin |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Jeff P. Prostok | | |
| DATE<br>9/15/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Jeff P. Prostok | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
**FORSHEY PROSTOK LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@fosheyprostok.com
srosen@forsheyprostok.com

PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC | § | CASE NO. 23-90007-mxm11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Adversary Proc. No. 23-_____ |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BIG PICTURE LOANS, LLC, | § | |
| | § | |
| Defendant. | | |

## COMPLAINT FOR TURNOVER PURSUANT TO SECTIONS 542(a), 542(b), AND 542(e) OF THE BANKRUPTCY CODE

COMES NOW Plaintiff Eventide Credit Acquisitions, LLC  (the "**Debtor**" or "**Plaintiff**"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, and as plaintiff in the above-captioned adversary proceeding, and hereby files this *Complaint for Turnover pursuant to Sections 542(a), 542(b), and 542(e) of the Bankruptcy Code* (the "**Complaint**"),[1] upon knowledge of its own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      The Debtor is facing a liquidity crisis due to the payment default by Big Picture Loans, LLC ("**Big Picture**" or "**Defendant**") under the terms of Secured Promissory Note ("**Note**") and Loan and Security Agreement ("**LSA**") dated September 18, 2020, copies of which are attached hereto as **Exhibit A** and **Exhibit B**, respectively.  The current outstanding principal balance due under the Note is $26,850,000 plus late fees and default interest.  The amounts due to the Debtor under the Note and LSA provide the Debtor's primary source of cash flow, which the Debtor needs to fund its bankruptcy case and pay its legitimate creditors.

2.      As a result of Big Picture's payment default, all amounts owed under the Note and LSA became immediately due and payable without notice or demand and the collateral securing the Note is subject to turnover under section 542 of the Bankruptcy Code.  In addition, both the LSA and section 542(e) of the Bankruptcy Code entitle the Debtor to obtain information from Big Picture, which the Debtor needs to provide notice of the Debtor's bankruptcy case to potential (albeit disputed) creditors. The Debtor is entitled to relief requiring turnover of cash, other assets, and information belonging to and withheld from the Debtor, among other relief requested herein.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

5.      The statutory predicates for the relief requested herein are sections 362(a)(3), 542(a), 542(b), and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") as well

as rules 7001(1), 7001(7), and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A), (E) and (O).  To the extent this matter is determined to be non-core, Plaintiff consents to the entry of final orders and judgments by this Court in this adversary proceeding.

7.      The Defendant, Big Picture, is an indirect wholly-owned economic arm of The Lac Vieux Desert Band of Lake Superior Chippewa Indians ("**LVD**" or the "**Tribe**").[1]  In addition to the fact that Big Picture waived sovereign immunity in the Note and LSA for actions based on a breach or default under the Note and LSA, the Supreme Court has recently held that the Bankruptcy Code abrogates the sovereign immunity of federally recognized Indian tribes and arms thereof, eliminating any doubt that the automatic stay is fully applicable to such parties to the same extent as to any other party. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1698-99 (2023).

## THE PARTIES

8.      Plaintiff Eventide Credit Acquisitions, LLC is a Delaware limited liability company with its principal place of business in Texas.

9.      Defendant Big Picture is a limited liability company organized under the laws of the LVD with its principal place of business on LVD's reservation in the Upper Peninsula of Michigan. Big Picture may be served with process by serving its Co-Manager and CEO, Michelle Hazen, at E23970 Pow Wow Trail, Watersmeet, MI 49969.  Big Picture also uses the following address: P.O. Box 704, Watersmeet, MI 49969.

---

[1] Big Picture is a wholly-owned subsidiary of Tribal Economic Development Holdings, LLC ("**TED**"), a limited liability company organized under the laws of The Lac Vieux Desert Band of Lake Superior Chippewa Indians.

## FACTUAL BACKGROUND

**A.      The LVD's Tribal Lending Operations**

10.      Big Picture is an online tribal lender engaged in the business of making online consumer loans to customers throughout the United States.

11.      In 2012, LVD began offering loans to consumers through a tribal lending entity called Red Rock Tribal Lending, LLC ("**Red Rock**").  To assist in the growth of LVD's lending portfolios and to provide necessary services to those portfolios, Red Rock entered into a servicing agreement with Bellicose VI, Inc. ("**Bellicose**") to obtain data and other services.  In 2012, Bellicose assigned its rights under its servicing contract with Red Rock to its affiliate, SourcePoint VI, LLC ("**SourcePoint**"). The services Red Rock obtained from Bellicose and SourcePoint included, *inter alia*, compliance management assistance, marketing material and strategy development, and the development of risk modeling and data analytics and processes.

12.      Subsequently, LVD sought to acquire its then service provider, SourcePoint, along with some of its affiliates.  After its parent company, Bellicose Capital, LLC ("**Bellicose Capital**") restructured to accommodate a transaction, LVD eventually acquired Bellicose Capital, and its pertinent assets, including SourcePoint.

13.      Next, the acquisition was generally structured as follows:

(a)      LVD formed Big Picture, its new lending entity.

(b)      LVD formed Ascension Technologies, LLC ("**Ascension**"), its new servicing company.

(c)      LVD formed TED, as the parent company, to wholly own both Big Picture and Ascension.

(d)      LVD transferred all assets and liabilities from Red Rock to Ascension and Big Picture.  Red Rock dissolved.

(e)      The Debtor was formed as an entity through which Bellicose Capital owners could sell Bellicose Capital to LVD through TED.

(f)    Bellicose Capital was acquired by LVD Tribal Acquisition Company, LLC ("**TAC**") and its assets were transferred to Ascension and its liabilities to Big Picture.  TAC was then dissolved.  This left TED as the holding company for its subsidiaries, Big Picture and Ascension.

(g)    Big Picture and Ascension then entered into a virtually identical servicing agreement as was between Red Rock and SourcePoint.

14.    The sale of Bellicose Capital to LVD was evidenced through a number of transaction documents (the "**Prior Transaction Documents**") which left the Debtor as a secured creditor in a seller-financed transaction, and LVD and TED, as the buyer and parent of Big Picture and Ascension.  The sale closed on January 26, 2016, and was completed by February 15, 2016, and a note was issued by Big Picture to the Debtor as payment by Big Picture for the sale of Bellicose Capital to Big Picture (the **"Old Note"**).

15.    On August 20, 2020, the Debtor, LVD, TED, Big Picture, and Ascension entered into a Confidential Settlement Agreement which, e.g., restructured the indebtedness owed to the Debtor arising from the prior sale transaction.

16.    As a result, on September 18, 2020, the Debtor and Big Picture executed the LSA and Big Picture executed the Note in favor of the Debtor in the principal amount of $32,097,058.  The "**Collateral**" securing the Note and LSA includes all of Big Picture's "present and future right, title, and interest in, to and under" all of Big Picture's property, including, e.g.:

> All now existing or hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of an [sic] Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof) (as those capitalized terms are defined by Article 9 of the UCC and the Loan Documents).

(See Ex. B, § 2.2(b)(i), p. 2).

17.     In section 6.3 of the LSA, Big Picture also gave the Debtor a power of attorney authorizing the Debtor to take all actions as may be necessary to convert the Collateral into cash. (See Ex. B, § 6.3, pp. 12-13).

**B.    Big Picture's Purported Notice of Termination of the Note and LSA**

18.     On August 3, 2023, Big Picture sent the Debtor a purported Notice of Termination (the "**Notice of Termination**") in which it contends that a *force majeure* event had occurred under section 6.9 of the LSA.  A copy of the Notice of Termination is attached hereto as **Exhibit C**.  The Notice of Termination provides that the LSA and Note will purportedly be "terminated on November 1, 2023, unless a final judgment [against Martorello][2] issues sooner, which will cause immediate termination."   Big Picture contends that a recent $43 million ruling against Matt Martorello, manager of the Debtor, imperils the business of Big Picture enough to constitute a *force majeure* and relieve Big Picture from its obligations under the Note.

19.     The Debtor disputes Big Picture's contention that a *force majeure* event has occurred under the Note and LSA.  Indeed, there has never been an adjudication (let alone any finding) by a court of competent jurisdiction (or, for that matter, any tribunal) that *Big Picture's performance under the LSA*, which is subject to Delaware law, is unlawful.

20.     The Notice of Termination also notified the Debtor of Big Picture's intent to "cease all loan payments to [the Debtor] but escrow the funds in anticipation of [the Debtor's] dispute over the applicability of the Force Majeure clause."  (See Ex. C, p. 2).  However, as the Debtor made Big Picture aware through its response to the Notice of Termination, neither the Note nor the LSA authorizes Borrower to escrow funds in place of making the payments required under

---

[2] Big Picture's alleged *force majeure* argument centers on an adverse summary judgment ruling against Martorello in a suit in the Eastern District of Virginia, where the Debtor is not a party.  Although a judgment against Martorello has not yet been entered, Martorello plans to appeal the judgment, as and when entered, to the Fourth Circuit.

the Note and LSA.  Stated differently, placing required funds in an escrow account, even if this occurred, *is not* permitted under the Note and LSA and *would not* prevent a payment default from occurring under the Note and LSA.  To the contrary, Section 10 of the Note, "Unconditional Payment", makes clear that payments hereunder are to be made "absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff."  (See Ex. A, § 10, p. 2).

**C.     The Payment Default under the Note and LSA**

21.     Under the terms of the Note, Big Picture was obligated to make a payment to the Debtor in the amount of $175,000 on September 1, 2023 (the "**September Payment**").

22.     Big Picture failed to make September Payment when due (the "**Payment Default**").[3]

23.     Section 6.1(a)(1) of the LSA defines an "**Event of Default**" as a "failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note."  (See Ex. B, § 6.1(a)(1), p. 10).  The date that is three (3) days from the date of the payment due date was September 4, 2023.  As of the date of filing this Complaint, the September Payment has not been received. Consequently, the Payment Default constitutes an Event of Default under section 6.1(a)(1) of the LSA and sections 5(a) and 10 of the Note has occurred.

24.     The LSA and Note do not provide for any right to cure an Event of Default resulting from a Payment Default.  (See Note, Ex. A, § 10, "Unconditional Payment").

25.     Section 6.2(a) of the LSA provides that, if an Event of Default occurs, at Eventide's election, "**all Obligations [under the Note and LSA] shall become immediately due and**

---

[3] As discussed *infra*, prior to the Payment Default, Big Picture sent a Notice of Termination of the LSA and Note, in which it declares that a purported *force majeure* event had occurred and notified the Debtor of its intention to terminate the Note and LSA on or before November 1, 2023.

payable *without notice or demand*."  (See Ex. B, § 6.2(a), p. 11) (emphasis added).  Although Big Picture waived all forms of notice and presentment in section 7.1 of the LSA,[4] Eventide notified Big Picture on September 5, 2023, of its election that all Obligations under the Note and LSA had become immediately due and payable as a result of Big Picture's Payment Default (the "**Notice of Default and Acceleration**"), a copy of which is attached hereto as **Exhibit D**.

      26.    The Notice of Default and Acceleration further advised Pig Picture that, pursuant to section 6.2(d) of the LSA, Big Picture must "**accelerate all payments … and in good faith pursue winding up the business of [Big Picture] in a manner that maximizes value to Eventide.**"  (See Ex. B, § 6.2(d), p. 11; Ex. C, pp. 2-3).  In this regard, Section 2.3 of the LSA provides:

> [F]ollowing an Event of Default or at maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower with reference to the Collateral.  *All proceeds of and collection of Collateral shall be for the purpose of and satisfying the Note and making disbursements thereunder.* From and after an Event of Default which has not been waived by Lender, *"all proceeds of and collections from the Collateral shall be held in trust by Borrower for the benefit of Lender;* and, from and after an Event of Default which has not been waived by Lender, *Borrower agrees to deliver to Lender on the dates of receipt thereof by Borrower, duly endorsed to Lender or to bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.*

(See Ex. B, § 2.3, pp. 3-4) (emphasis added).

      27.    As a result of Big Picture's Payment Default and the Debtor's election to accelerate, all amounts due under the Note and LSA are currently due and payable by Big Picture to the Debtor.  In addition, Big Picture is required to immediately turn over all cash and related

---

[4] Section 7.1 of the LSA provides that, "Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof."  (See Ex. B, § 7.1, p. 14).

current assets/reserves (which appear to be approximately $5.6 million) to the Debtor *and* make ongoing daily wires to Eventide as Big Picture unwinds its business as required under sections 2.3 and 6.2(d) of the LSA.

28.    Despite its Payment Default and obligations under the Note and LSA, Big Picture has not turned over its cash and current reserves to the Debtor or begun turning over the proceeds of the Collateral.  In addition, on information and belief, Big Picture also has not begun winding up its business operations.

<u>FIRST CLAIM FOR RELIEF</u>
**(11 U.S.C. §§ 542(a) and (b) – Turnover of Existing Collateral to the Debtor)**

29.    The Debtor repeats and realleges Paragraphs 1-28 of this Complaint as if fully set forth herein.

30.    Section 542(a) of the Bankruptcy Code provides, in pertinent part, that "an entity … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title … shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

31.    Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt may be offset under [11 U.S.C. § 553]."  11 U.S.C. § 542(b).

32.    Section 541(a) of the Bankruptcy Code provides, in pertinent part, that the bankruptcy estate is comprised, among other things, of "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).

33.    The Note and LSA constitute property of the Debtor's estate.

34.    Big Picture's Payment Default constitutes an Event of Default under section 6.1(a) of the LSA and section 5(a) of the Note.

35.     Pursuant to section 6.2 of the LSA, the Debtor made its demand by electing to execute on its right to accelerate all amounts due under the Note and LSA to become Immediately due and payable.

36.     Consequently, the Note has indeed matured and the full outstanding balance of the Note in the amount of $26,850,000 plus accruing late fees and default interest.

37.     Section 2.3 of the LSA provides that, following an Event of Default, "all proceeds of any collections of Collateral shall be for the purpose of satisfying the Note and making disbursements thereunder."   Section 2.3 further provides that, following an Event of Default, "all proceeds of and collections of the Collateral shall be held in trust by [Big Picture] for the benefit of the [Debtor]." (See Ex. B, § 2.3, pp. 3-4).

38.     On information and belief, Big Picture is currently holding proceeds from the Collateral, in the form of cash and reserves, in the amount of approximately $5.6 million (the "**Existing Collateral**").  The Existing Collateral, which Big Picture is now required to hold in trust for the Debtor pursuant to section 2.3 of the LSA, is property of the Debtor's estate pursuant to section 541(a) of the Bankruptcy Code.

39.     The Existing Collateral is not of inconsequential value to the Debtor's estate and could be used under 11 U.S.C. § 363 to, among other things, pay the Debtor's legitimate creditors and the ongoing expenses of the Debtor's estate.

40.     No part of the Existing Collateral may be offset under section 553 of the Bankruptcy Code.

41.     Despite Section 10 of the Note, "Unconditional Payment", which makes clear that payments hereunder are to be made "absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff," as set forth in the Notice of Termination, Big Picture has indicated that it does not intend to make any further payments pursuant to the Note and LSA.

42.     Accordingly, pursuant to sections 542(a) and (b) of the Bankruptcy Code, the

Debtor requests that the Court enter an order compelling Big Picture to turn over the Existing Collateral to the Debtor.

**SECOND CLAIM FOR RELIEF**
**(11 U.S.C. § 542(a) and (b) – Turnover of Future Collateral to the Debtor)**

43.    The Debtor repeats and realleges Paragraphs 1-42 of this Complaint as if fully set forth herein.

44.    In addition to the foregoing, section 2.3 of the LSA also provides that, "from and after an Event of Default which has not been waived by Lender, Borrower [Big Picture] agrees to delivery to Lender [Debtor] on the dates of receipt thereof by Borrower, duly endorsed to Lender or bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower."  (See Ex. B, § 2.3, p. 4).

45.    On information and belief, Big Picture receives loan payments from consumers on account of its tribal lending operations on a daily basis.  The Debtor believes Big Picture's current loans outstanding equal approximately $26,000,000 and that Big Picture receives proceeds from the loans, which constitute the Debtor's Collateral, of approximately $3,000,000 per week (the "**Future Collateral Proceeds**").

46.    The Future Collateral Proceeds, as and when received by Big Picture, which Big Picture is obligated to "deliver to [the Debtor] on the dates of receipt thereof by [Big Picture]," likewise constitutes property of the Debtor's estate pursuant to section 541(a) of the Bankruptcy Code.

47.    The Future Collateral Proceeds is not of inconsequential value to the Debtor's estate and could be used under 11 U.S.C. § 363 to, among other things, pay the Debtor's legitimate creditors and the ongoing expenses of the Debtor's estate.

48.    No part of the Future Collateral Proceeds may be offset under section 553 of the Bankruptcy Code.

49.    Despite Section 10 of the Note, "Unconditional Payment", which makes clear that

payments hereunder are to be made "absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff," as set forth in the Notice of Termination, Big Picture has indicated that it does not intend to make any further payments pursuant to the Note and LSA.

50.    Accordingly, pursuant to sections 542(a) and (b) of the Bankruptcy Code, the Debtor requests that the Court enter an order compelling Big Picture to turn over the Future Collateral Proceeds to the Debtor "on the dates of receipt thereof by [Big Picture]" and "in the identical form received by [Big Picture]."

### THIRD CLAIM FOR RELIEF
### (11 U.S.C. § 542(e) and LSA § 4.2 – Turnover of Information)

51.    The Debtor repeats and realleges Paragraphs 1-50 of this Complaint as if fully set forth herein.

52.    Section 542(e) of the Bankruptcy Code provides, in pertinent part, that, "after notice and a hearing, the court may order an attorney, accountant, or other person that holds information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."  11 U.S.C. § 542(e).

53.    The definition of Collateral under section 2.2(b)(iii) of the LSA includes:

> All present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software for accessing and manipulating such information, provided [Big Picture] may retain copies of the same business records and information as required by applicable law.

(See Ex. B, §2.2(b)(iii), p. 2).  Consequently, Big Picture's business records, which Big Picture is now required to hold in trust for the Debtor pursuant to section 2.3 of the LSA, constitute property of the Debtor's estate pursuant to section 541(a) of the Bankruptcy Code for which the Court may order turnover pursuant to section 542(e) of the Bankruptcy Code.

54.     In addition to section 542(e) of the Bankruptcy Code, section 4.2 of the LSA
provides, in pertinent part, as follows:

> 4.2   <u>Books and Records: Inspection</u>. Borrower will at all times
> keep proper books of account in which full, true and correct entries
> will be made of its transactions in accordance with its standard
> practices, consistently applied. ***Borrower will at all reasonable
> times, and on reasonable advance notice, make its books,
> records, and accounting practices and procedures available in
> its offices for a field inspection and examination by Lender
> and/or Lender's representatives and will permit inspection of
> the Collateral by Lender and/or Lender1s representatives (a
> "<u>Field Inspection</u>").*** Lender may, at its option and expense, require
> a Field Inspection not more than one (I) time in any calendar
> quarter, ***unless an Event of Default shall occur which has not
> been waived by Lender, in which case Lender shall be
> permitted to require a Field Inspection as frequently as Lender
> deems reasonably necessary.*** In the event that an infraction is
> found, all reasonable costs and expenses incurred by Lender in
> connection with any Field Inspection shall be borne by Borrower,
> otherwise such costs shall be borne by Lender. ***Borrower will from
> time to time furnish Lender with such information and
> statements as Lender may reasonably request with respect to
> the Obligations or Lender's security interest in the Collateral,
> and Borrower shall have a commercially reasonable time
> period to produce such information and statements.***

(See Ex. 2, p. 6, § 4.2) (emphasis added).

55.     On September 8, 2023, the Debtor sent Big Picture a *Demand for Information
and/or Field Inspection* (the "**Information Demand**"), a copy of which is attached hereto as
**Exhibit E**, demanding that Big Picture either (i) provide information (the "**Requested
Information**") to the Debtor regarding Big Picture's borrowers (the "**Borrowers**") from the period
between September 6, 2019 to September 5, 2023 (the "**Timeframe**"), or (ii) permit the Debtor or
a company retained by the Debtor to perform a Field Inspection pursuant to the LSA to obtain
such information.

56.     The term Requested Information, as defined in the Information Demand and as
requested herein, includes, as to each Borrower and loan made during the Timeframe, the
following information:

   (i)     Each Borrower's full name and address;

   (ii)    Each Borrower's email address;

   (iii)   Each Borrower's loan date;

   (iv)   Each Borrower's loan amount; and

   (v)    The date and amount of each Borrower's payment(s) on the loans.

57.     The Requested Information is needed by the Debtor so that it can give notice of the Debtor's bankruptcy case to all parties who may assert claims against the Debtor.  Although the Debtor strenuously disputes that any Big Picture Borrowers hold valid claims, it nevertheless is required to give notice of the Bankruptcy Case and deadline for filing proofs of claim to holders of known disputed claims.

58.     Accordingly, pursuant to section 542(e) of the Bankruptcy Code and/or section 4.2 of the LSA, the Debtor requests that the Court enter an order compelling Big Picture to turn over the Requested Information regarding the Borrowers during the Timeframe to the Debtor.

### **RESERVATION OF RIGHTS REGARDING THE AUTOMATIC STAY**
**(11 U.S.C. § 362(a))**

59.     The Debtor repeats and realleges Paragraphs 1-58 of this Complaint as if fully set forth herein.

60.     As discussed above, Big Picture previously notified the Debtor in its Notice of Termination that it intends to terminate the Note and LSA on November 1, 2023, or sooner, if a judgment is entered against Martorello in a case pending in the Eastern District of Virginia. Neither of which has occurred.  Any action by Big Picture to terminate the Note or LSA, or otherwise interfere with the Debtor's rights under the Note and LSA, would violate the automatic stay.

61.     In addition, two new cases were recently filed in late June 2023 and early July 2023 against Big Picture, the Debtor, Martorello, and another company affiliated with Martorello

in federal district courts in Indiana and Illinois.[5]   However, the cases were dismissed on the Petition Date with prejudice as to the named plaintiffs and *without prejudice* as to the claims of the putative classes.  The Debtor does not know the reason for the dismissal.  However, the Debtor believes that Big Picture may intend to use either the Existing Collateral or Future Collateral Proceeds to make a settlement payment on behalf of Big Picture.  Any attempt by Big Picture to use the Existing Collateral or Future Collateral Proceeds for its own purposes, including to settle litigation asserted against Big Picture, would violate the automatic stay.

62.     The Debtor reserves the right to amend this Complaint to seek compensatory and punitive damages against Big Picture for violating the automatic stay in the event Big Picture (i) takes any action to terminate the Note or LSA, (ii) otherwise interferes with the Debtor's rights under the Note and LSA, and/or (iii) uses the Existing Collateral or Future Collateral Proceeds for its own purposes, including to settle claims asserted against Big Picture.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Debtor respectfully demands judgment against Big Picture in this adversary proceeding and requests relief as follows:

(i)      For Count I of this Complaint, entry of an order compelling Big Picture to turn over the Existing Collateral to the Debtor;

(ii)     For Count II of this Complaint, entry of an order compelling Big Picture to turn over the Future Collateral Proceeds of the Debtor on the dates of receipt thereof by Big Picture and in the identical form received by Big Picture;

(iii)    For Count III of this Complaint, entry of an order compelling Big Picture to turn over the Requested Information for the relevant Timeframe; and,

(iv)    For any such other and further relief to which the Debtor may be justly entitled.

---

[5] The case style and numbers for the actions asserted against the parties are:  (i) *Gernenz v. Big Picture Loans et al.*, Civil Action No. 2:23-cv-221, pending in the Northern District of Indiana, and (ii) *Hall v. Big Picture Loans*, 1:23-cv-04502, pending in the Northern District of Illinois.

DATED: September 15, 2023                    Respectfully submitted,

                                             */s/ Jeff P. Prostok*
                                             Jeff P. Prostok
                                             State Bar No. 16352500
                                             Suzanne K. Rosen
                                             State Bar No. 00798518
                                             **FORSHEY PROSTOK LLP**
                                             777 Main Street, Suite 1550
                                             Fort Worth, Texas 76102
                                             Telephone: (817) 877-8855
                                             Facsimile: (817) 877-4151
                                             jprostok@fosheyprostok.com
                                             srosen@forsheyprostok.com

                                             PROPOSED COUNSEL FOR THE
                                             DEBTOR AND DEBTOR-IN-POSSESSION

# EXHIBIT "A"

## SECURED PROMISSORY NOTE

**$32,097,958**                                                        **September 18, 2020**

FOR VALUE RECEIVED, the undersigned, Big Picture Loans, LLC (the "Borrower"), a subsidiary of Tribal Economic Development Holdings, LLC ("TED") a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized Indian Tribe, by executing this secured promissory note (the "Note"), hereby promises to pay to the order of Eventide Credit Acquisitions, LLC (the "Lender"), a Delaware limited liability company at 1920 McKinney Ave., 7th Floor, Dallas, TX 75201 or at such other place as the Lender may direct, in lawful money of the United States of America constituting legal tender in payment of all sums owed to the Lender by the Borrower pursuant to the Transaction Documents as defined in the Loan Agreement (defined below) and of all debts and dues, public and private, together with interest thereon calculated at the rate and in the manner set forth herein and other charges owed to the Lender as provided in the Loan Agreement, the principal amount under this Note, in an aggregate amount of up to $32,550,000.00. The Borrower and the Lender is sometimes referred to herein individually as a "Party," and together as the "Parties." Payment of principal and interest shall be per the following provisions:

**1. Payments.**

(a)      Interest on the Loan Amount has and shall accrue at the Applicable Rate (defined below), calculated with a commencement date of September 1, 2020 and continuing until the loan maturity date, which shall be September 1, 2025 (the "Maturity Date") unless sooner repaid by the Borrower. Unless Lender and Borrower mutually agree in writing to a different repayment schedule, Borrower shall make payments as set forth in the attached amortization schedule, attached hereto as **Schedule A**.

(b)      The applicable interest rate hereunder (the "Applicable Rate") shall be equal to the IRS AFR as of the effective date of the Note, which is 0.35% per annum

**2. Additional Provisions Regarding Interest**. If applicable, interest on all principal amounts outstanding from time to time hereunder shall be calculated based on a 360-day year applied to the actual number of days upon which principal is outstanding, by multiplying the product of the principal amount and the Applicable Rate set forth herein by the actual number of days elapsed, and dividing by 360.

**3. Loan Agreement**. This Note is issued under the terms of the Loan and Security Agreement (the "Loan Agreement") of even date herewith between the Lender and the Borrower to which reference is made for a statement of the terms and conditions under which the indebtedness was incurred and under which the Lender may accelerate the Borrower's obligation to make payments hereunder. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement. In the event of a conflict between this Note and the Loan Agreement, the terms of the Loan Agreement shall prevail.

**4. Use of Proceeds**. The Borrower shall use proceeds under this Note solely for the purposes allowed under the Loan Agreement.

**5. Events of Default**. Upon the occurrence of any one or more of the following events ("Events of Default"):

(a) Failure to make any payment of the principal or interest, other charges or amounts on this Note or the other Transaction Documents on the date when due and payable; or

(b) Any other material violation of this Note or the Loan Agreement then, or at any time thereafter during the continuance of any such event, the Lender may give notice of such Event of Default to the Borrower and declare this Note and the indebtedness evidenced hereby shall become forthwith due and payable, both as to principal and interest, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived.

**6. Usury Interest**. Nothing contained herein, nor any transaction related hereto, shall be construed or operate as to require the Borrower to pay, or the Lender to accept, interest at a rate greater than it is lawful in such case to contract for, or to make any payment or to do any act contrary to law. It is understood and agreed that in the event that the payment of any interest due hereunder would subject the Lender hereof to any penalty under applicable law, then *ipso facto* the obligations of the undersigned to make such payment shall be reduced to the highest rate authorized under applicable law, and that if any clauses or provisions contained herein or in any of the other Transaction Documents operate or would prospectively operate to invalidate this Note or any of the other Transaction Documents, in whole or in part, then only such clauses or provisions shall be held to be invalid.

**7. No Waiver or Release**. If there is any Event of Default hereunder, the failure of the Lender hereof promptly to exercise its right to declare the principal remaining unmatured hereunder to be immediately due and payable shall not constitute a waiver of such right while such default continues nor a waiver of such right in connection with any future default on the part of the Borrower. Its expressly understood and agreed that the Borrower shall not be released from liability hereon due to any forbearance or extension of time granted, with or without notice or consent of the Borrower.

**8. Waivers**. The Borrower hereby waives demand, presentment for payment, notice of dishonor, protest, and notice of protest and diligence in collection or bringing suit and agrees that the Lender may accept partial payment, or release or exchange security or collateral, without discharging or releasing any unreleased collateral or the obligations evidenced hereby.

**9. Limited Waiver of Sovereign Immunity**. Section 8 of the Loan Agreement is incorporated by referenced herein *mutatis mutandis*.

**10. Unconditional Payment.** Subject to and as limited by Section 1, Borrower is and shall be obligated to pay principal, interest, and any and all other amounts which become payable hereunder or under the Transaction Documents absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff.

**11. Miscellaneous**. As used herein, the terms "Borrower," and "Lender" shall be deemed to include their respective successors, legal representatives and permitted assigns, whether by voluntary action of the Parties or by operation of law.

**12. Governing Law.** The interpretation, validity and performance of this Note shall be governed by the laws of the State of Delaware, without regard to the conflicts of law rules of such State.

**13. Modification.** This Note may not be modified except by written agreement signed by the Borrower and the Lender, or by their respective successors or assigns.

**14. Notices.** All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon facsimile and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the third (3rd) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each party at the following addresses:

|  |  |
|---|---|
| If to Lender: | Eventide Credit Acquisitions, LLC<br>Attn: Matt Martorello<br>1920 McKinney Ave., 7th Floor<br>Dallas, Texas 75201 |
|  | With a copy to counsel: |
|  | Loeb & Loeb LLP<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067 |
| If to Borrower | Big Picture Loans, LLC<br>Attn: Co-Managers<br>E23970 Pow Wow Trail<br>P.O. Box 704<br>Watersmeet, Michigan 49969 |
|  | and |
|  | Tribal Economic Development, LLC as sole member of Big Picture Loans, LLC Attn: General Counsel<br>P.O. Box 704<br>Watersmeet, Michigan 49969 |
|  | With a copy to counsel: |
|  | Rosette, LLP<br>44 Grandville Ave. SW, Suite 300<br>Grand Rapids, Michigan 49503 |

or to such other different address(as) as the Lender or the Borrower may specify in writing using the notice procedure called for in this Section 12.

**15. No Third Party Beneficiaries**. This Note is made for the sole protection and benefit of the Parties hereto and no other person or organization shall have any right of action hereon, except for any permitted successors and assigns.

**16. Successors and Assigns**. This Note shall be binding upon the Borrower and its successors and assigns, except that (i) the Borrower may not assign or transfer this Note without the prior written consent of the Lender and (ii) the Lender may assign or transfer this Note to an affiliate without the prior written consent of the Borrower. This Note shall inure to the benefit of the Lender and unless otherwise expressly given in a particular provision hereof, all subsequent successors and assigns.

**17. Integration**. This Note, together with the other Transaction Documents (as defined in the Loan Agreement) embody the entire agreement of the Borrower and the Lender (by acceptance hereof) regarding the subject matter hereof. There are no representations, promises, warranties, understandings or agreements expressed or implied, oral, or otherwise, in relation thereto, except those expressly referred to or set forth herein. Borrower acknowledges that the execution and delivery of this Note is its free and voluntary act and deed, and that said execution and delivery have not been induced by, nor done in reliance upon, any representations, promises, warranties, understandings or agreements made by Lender, its agents, officers, employees or representatives.

**18. Modifications**. No promise, representation, warranty or agreement made subsequent to the execution and delivery of this Note, and no revocation, partial or otherwise, or change, amendment or addition to, or alteration or modification of, this Note shall be valid unless the same shall be in writing signed by all Parties hereto.

**19. Time of Essence**. Time is expressly made of the essence of this Note.

**20. Severability**. The illegality or unenforceability of any provision of this Note or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Note or any instrument or agreement required hereunder.

**21. Headings**. The headings or captions of sections and paragraphs in this Note are for reference only, do not define or limit the provisions of such sections or paragraphs, and shall not affect the interpretation of this Note.

[signature page follows]

IN WITNESS WHEREOF the Borrower have caused this Note to be executed, sealed and delivered as of the date first set forth above, although actually executed on the date or dates reflected below.

BORROWER:

Big Picture Loans, LLC

By: _Michelle Hazen_
Name: Michelle Hazen
Title: Co-Manager & CEO

**SCHEDULE A**

| | 0.35% | September Rate | | |
|---|---|---|---|---|
| | 32,107,320.00 | | | |
| | | | | |
| | Month | Amount | Interest | Principal |
| 10/1/2020 | 1 | 150000 | $9,364.64 | 31,966,684.64 |
| 11/1/2020 | 2 | 75000 | $9,323.62 | 31,901,008.25 |
| 12/1/2020 | 3 | 75000 | $9,304.46 | 31,835,312.71 |
| 1/1/2021 | 4 | 75000 | $9,285.30 | 31,769,598.01 |
| 2/1/2021 | 5 | 75000 | $9,266.13 | 31,703,864.14 |
| 3/1/2021 | 6 | 175000 | $9,246.96 | 31,538,111.10 |
| 4/1/2021 | 7 | 175000 | $9,198.62 | 31,372,309.72 |
| 5/1/2021 | 8 | 175000 | $9,150.26 | 31,206,459.98 |
| 6/1/2021 | 9 | 175000 | $9,101.88 | 31,040,561.86 |
| 7/1/2021 | 10 | 175000 | $9,053.50 | 30,874,615.36 |
| 8/1/2021 | 11 | 175000 | $9,005.10 | 30,708,620.46 |
| 9/1/2021 | 12 | 175000 | $8,956.68 | 30,542,577.14 |
| 10/1/2021 | 13 | 175000 | $8,908.25 | 30,376,485.39 |
| 11/1/2021 | 14 | 175000 | $8,859.81 | 30,210,345.20 |
| 12/1/2021 | 15 | 175000 | $8,811.35 | 30,044,156.55 |
| 1/1/2022 | 16 | 175000 | $8,762.88 | 29,877,919.43 |
| 2/1/2022 | 17 | 175000 | $8,714.39 | 29,711,633.82 |
| 3/1/2022 | 18 | 175000 | $8,665.89 | 29,545,299.71 |
| 4/1/2022 | 19 | 175000 | $8,617.38 | 29,378,917.09 |
| 5/1/2022 | 20 | 175000 | $8,568.85 | 29,212,485.94 |

| 6/1/2022 | 21 | 175000 | $8,520.31 | 29,046,006.25 |
| 7/1/2022 | 22 | 175000 | $8,471.75 | 28,879,478.00 |
| 8/1/2022 | 23 | 175000 | $8,423.18 | 28,712,901.18 |
| 9/1/2022 | 24 | 175000 | $8,374.60 | 28,546,275.78 |
| 10/1/2022 | 25 | 175000 | $8,326.00 | 28,379,601.78 |
| 11/1/2022 | 26 | 175000 | $8,277.38 | 28,212,879.16 |
| 12/1/2022 | 27 | 175000 | $8,228.76 | 28,046,107.92 |
| 1/1/2023 | 28 | 175000 | $8,180.11 | 27,879,288.03 |
| 2/1/2023 | 29 | 175000 | $8,131.46 | 27,712,419.49 |
| 3/1/2023 | 30 | 175000 | $8,082.79 | 27,545,502.28 |
| 4/1/2023 | 31 | 175000 | $8,034.10 | 27,378,536.38 |
| 5/1/2023 | 32 | 175000 | $7,985.41 | 27,211,521.79 |
| 6/1/2023 | 33 | 175000 | $7,936.69 | 27,044,458.48 |
| 7/1/2023 | 34 | 175000 | $7,887.97 | 26,877,346.45 |
| 8/1/2023 | 35 | 175000 | $7,839.23 | 26,710,185.68 |
| 9/1/2023 | 36 | 175000 | $7,790.47 | 26,542,976.15 |
| 10/1/2023 | 37 | 175000 | $7,741.70 | 26,375,717.85 |
| 11/1/2023 | 38 | 175000 | $7,692.92 | 26,208,410.77 |
| 12/1/2023 | 39 | 175000 | $7,644.12 | 26,041,054.89 |
| 1/1/2024 | 40 | 175000 | $7,595.31 | 25,873,650.20 |
| 2/1/2024 | 41 | 175000 | $7,546.48 | 25,706,196.68 |
| 3/1/2024 | 42 | 1075000 | $7,497.64 | 24,638,694.32 |

| 4/1/2024 | 43 | 1075000 | $7,186.29 | 23,570,880.60 |
| 5/1/2024 | 44 | 1075000 | $6,874.84 | 22,502,755.44 |
| 6/1/2024 | 45 | 1075000 | $6,563.30 | 21,434,318.75 |
| 7/1/2024 | 46 | 1075000 | $6,251.68 | 20,365,570.42 |
| 8/1/2024 | 47 | 1075000 | $5,939.96 | 19,296,510.38 |
| 9/1/2024 | 48 | 1075000 | $5,628.15 | 18,227,138.53 |
| 10/1/2024 | 49 | 1075000 | $5,316.25 | 17,157,454.78 |
| 11/1/2024 | 50 | 1075000 | $5,004.26 | 16,087,459.04 |
| 12/1/2024 | 51 | 1075000 | $4,692.18 | 15,017,151.21 |
| 1/1/2025 | 52 | 1075000 | $4,380.00 | 13,946,531.21 |
| 2/1/2025 | 53 | 1075000 | $4,067.74 | 12,875,598.95 |
| 3/1/2025 | 54 | 1075000 | $3,755.38 | 11,804,354.34 |
| 4/1/2025 | 55 | 1075000 | $3,442.94 | 10,732,797.27 |
| 5/1/2025 | 56 | 1075000 | $3,130.40 | 9,660,927.67 |
| 6/1/2025 | 57 | 1075000 | $2,817.77 | 8,588,745.44 |
| 7/1/2025 | 58 | 1075000 | $2,505.05 | 7,516,250.49 |
| 8/1/2025 | 59 | 1075000 | $2,192.24 | 6,443,442.73 |
| 9/1/2025 | 60 | 1075000 | $1,879.34 | 5,370,322.07 |
| 10/1/2025 | 61 | 1075000 | $1,566.34 | 4,296,888.41 |
| 11/1/2025 | 62 | 1075000 | $1,253.26 | 3,223,141.67 |
| 12/1/2025 | 63 | 1075000 | $940.08 | 2,149,081.76 |
| 1/1/2026 | 64 | 1075000 | $626.82 | 1,074,708.57 |

| | | | | |
|---|---|---|---|---|
| 2/1/2026 | 65 | 1075000 | $313.46 | 22.03 |
| | | | | |
| | | $32,550,000.00 | $442,702.03 | |
| | | | | |

# EXHIBIT "B"

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is made and entered into as of September *18*, 2020, by and between **Big Picture Loans, LLC** ("Borrower"), a wholly owned subsidiary of Tribal Economic Development Holdings, LLC, a wholly owned and operated economic arm and instrumentality of the **Lac Vieux Desert Band of Lake Superior Chippewa Indians** ("Tribe"), a federally-recognized Indian Tribe and Eventide Credit Acquisitions, LLC, a Delaware Limited Liability Company (the "Lender"). Each of the Borrower and the Lender is sometimes referred to herein individually as a "Party," and together as the "Parties."

### 1.    THE LOAN

1.1 Loan. Subject to the terms and conditions of this Agreement, Lender hereby agrees to loan a principal amount of $32,097,958.00 held by Lender for the benefit of Borrower (the "Loan") . The Loan shall be evidenced by a Secured Promissory Note of even date herewith (the "Note") given by Borrower to the order of Lender, in the face amount of the Loan. Borrower may, at any time and from time to time, prepay the outstanding principal balance of the Loan, in whole or in part, without premium or penalty. This Agreement, the Note, and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, are collectively hereinafter referred to as the "Transaction Documents."

1.2     Interest. Interest respecting the outstanding principal balance of the Loan will be charged to Borrower from time to time outstanding at the rate specified in the Note in accordance with the terms of the Note or as otherwise set forth in this Agreement. Interest on the Loan will be based on the actual number of days elapsed in a given calendar month and an assumed 360-day year.

1.3     Payments. Payments shall be set forth in the Note. Payments shall be set forth and paid as provided in the Note and this Agreement. In addition, the proceeds of the Loan shall be used to satisfy in full the obligations of the Borrower and its wholly owned subsidiaries as set forth as in Schedule 1.3.

1.4     Conduct of Business. Borrower is (and throughout the term of the Loan shall be) engaged in the business related to consumer financial services as authorized by the laws of the Tribe (the "Business").

### 2.    GRANT OF SECURITY INTEREST

2.1     Grant of Security Interest. In consideration of Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower hereby grants to Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined), including, without limitation, all claims against third parties arising out of or related to the Collateral. The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Note. Borrower hereby authorizes the filing of by Lender of any financing statement in any applicable jurisdiction.

2.2     Definitions. As used herein, the following definitions shall have the following meanings:

(a)     "Business Day" shall mean any day other than a Saturday, Sunday or day that is or shall be a federal holiday or a day on which banking institutions are required or authorized to close.

(b)     "Collateral" shall mean all of Borrower's present and future right, title and interest in, to and under the following described property (unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the UCC) directly owned by Borrower:

   (i)     All now existing or hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of an Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof) (as those capitalized terms are defined by Article 9 of the UCC and the Loan Documents);

   (ii)    To the extent, if any, not included in clause (i) above, each and every other item of personal property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all software use licenses, contracts and agreements, and all collateral for the payment of performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) or any accessions to any of the foregoing;

   (iii)   All present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software for accessing and manipulating such information, provided Borrower may retain copies of the same business records and information as required by applicable law.

   (iv)    Only to the extent that the property listed in clauses (i) – (iii) above does not satisfy and fulfill Borrower's entire obligations to Lender pursuant to the Transaction Documents, a second lien on any and all of the property of Borrower's existing or hereafter created subsidiaries, subordinate only to the obligations of the PMOF Special Situations Private Credit Fund LLC ("PMOF") credit facility or any similar arm's length senior credit facility executed by a subsidiary hereafter.

   All such information shall be subject to Section 5.4 of this Agreement.

(c)     "Collateral Account" shall mean any account(s) of Borrower (including banking, ACH processing, reserve or other accounts in which Borrower may have an economic interest) through which Borrower conducts its Business.

(d)     "Consumer" shall have the meaning given under the Code.

-2-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

(e)     "Consumer Loan" shall mean a "Small Loan Transaction" as defined in the Tribal Consumer Financial Services Regulatory Code.

(f)     "Consumer Loan Documents" shall mean all documents evidencing or otherwise executed by a Consumer in connection with a Consumer Loan.

(g)     "Material Adverse Effect" shall mean, with respect to Borrower, any event, occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of Borrower or any subsidiaries of Borrower.

(h)     "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower to Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to Lender; or are due indirectly by Borrower to Lender as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Transaction Documents. Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to Lender from time to time and all fees, costs and expenses referred to in this Agreement.

(i)     "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

(j)     "UCC" shall mean the Uniform Commercial Code in effect in the State of Michigan from time to time.

(k)     "Tribal" shall mean of or relating to the Tribe.

All other capitalized terms used in this Agreement shall have the meanings accorded to them in the UCC, and if not defined therein, in the applicable Transaction Document, or otherwise they shall have the word's or term's normal and customary use within the industry. Definitions referenced or used herein are for interpretation of this Agreement and the Transaction Documents only.

2.3 Ordinary Course of Business. Lender hereby authorizes and permits Borrower under the deposit account control agreements (unless otherwise waived by Lender) to receive the proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any, subject to Borrower's obligations under this Agreement and the Note; provided however, that following an Event of Default or at maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower with reference to the Collateral. All proceeds of and collections of Collateral shall be for the purpose of satisfying the Note and making disbursements thereunder. From and after an Event of Default which has not been waived by Lender, all proceeds of and

-3-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

19514708 1
233953-10001

collections of the Collateral shall be held in trust by Borrower for the benefit of the Lender; and, from and after an Event of Default which has not been waived by Lender, Borrower agrees to deliver to Lender on the dates of receipt thereof by Borrower, duly endorsed to Lender or to bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

2.4    Legends.  Borrower shall promptly make, stamp or record such entries or legends on Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper or electronic chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.  Such books and records may be maintained in electronic form (provided that any Consumer Loan shall be evidenced by electronic records which at all times comply with the requirements of all applicable federal and Tribal laws) and the entries or legends indicating or disclosing Lender's security interest shall be made electronically on any such electronic records.

## 3.    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that the following are, and after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents will be, true, correct and complete:

3.1    Organization and Qualification.  Borrower is a duly formed and existing limited liability company under Tribal law and is a wholly-owned subsidiary of Tribal Economic Development Holdings, LLC, and therefore the Tribe.  Borrower is in good standing under Tribal law and has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted.

3.2    Corporate Records.  Borrower's articles of organization have been duly filed and its articles of organization and operating agreement are in proper order.  All outstanding equity issued by Borrower was and is properly issued and all books and records of Borrower, including but not limited to its minute books, operating agreement, and books of account, are accurate and up to date and will be so maintained.

3.3    Title to Properties; Absence of Liens.  Borrower has good and clear record and marketable title to all of its properties and assets, including but not limited to Borrower's domain name (www.BigPictureLoans.com) and its related website, brand and/or trademarks, customer list(s), intellectual property and general intangibles, and all of its properties and assets, including the Collateral (as defined herein) to the extent owned by Borrower, is free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs.

3.4    Places of Business.  Borrower's principal place of business and chief executive office are located within Tribal jurisdiction at E23970 Pow Wow Trail, Watersmeet, Michigan, 49969, and Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each of its other places of business

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

19514708 1
233953-10001

3.5    Valid Obligations. The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary action and the Transaction Documents represent the legal, valid and binding obligation of Borrower and are fully enforceable according to their terms, except as limited by (a) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights and (b) the exercise of judicial discretion and the application of principles of equity, good faith, fair dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

3.6    Conflicts. There is no provision in Borrower's organizational documents, if any, or in any indenture, contract or agreement to which Borrower is a party which prohibits, limits or restricts the execution, delivery or performance of Borrower's obligations under this Agreement other than those associated with Section 5.2 (c) of the operating agreement of the Borrower, as it exists on the Effective Date.

3.7    Approvals. The execution, delivery and performance of the Transaction Documents have been duly authorized and approved by the Tribe as member of the TED, the sole member of the Borrower, and do not and will not require any additional approval of or filing with any Tribal or governmental agency or authority or any other Person.

3.8    Litigation. At the time of execution of this Agreement, with the exception of matters for which Lender has been provided notice in Exhibit A, there are no actions, suits or proceedings pending against Borrower or, to the knowledge of Borrower, threatened against Borrower which would be reasonably expected to cause a Material Adverse Effect.

3.9    Title to Collateral. As of the Effective Date and subject to Section 3.3, Borrower is the lawful owner of its assets constituting the Collateral, and the Collateral and each item thereof is free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby. Between August 20, 2020 and the Effective Date, there has not been a material change to the financial assets constituting the Collateral or to the operations and financial performance of Borrower. Subject to Section 3.3, Borrower has full power and authority to grant to Lender a security interest in the Collateral, and Borrower has not transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's right, title or interest therein), to any person other than Lender. The Collateral is valid and genuine in all respects.

3.10    Third Parties. Lender shall not be deemed to have assumed any liability or responsibility to Borrower or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower by Lender (which shall automatically be deemed to be without recourse to Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral owned by Borrower, or by releasing any Collateral to Borrower, shall not be deemed to have assumed any obligation or liability to any Consumer or to any other third party.

-5-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

3.11    <u>Taxes</u>.  Borrower has filed, or will file, all applicable and required federal, Tribal, state and other tax returns (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower has been fully paid. Borrower has established on its books reserves adequate for the payment of all applicable and required Federal, Tribal, state and other tax liabilities (if any).

3.12    <u>Use of Proceeds</u>.  Funds received under this Agreement may only be used for the operations of the Business.

3.13    <u>Compliance with Law</u>.  As of the Effective Date, Borrower is in compliance with all applicable laws.

3.14    <u>Disclosure</u>.  This Agreement (together with all exhibits and schedules hereto), the other Transaction Documents and the other agreements, certificates and other documents furnished to Lender by or on behalf of Borrower related to effectuating the Transaction Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.  There is no fact known to Borrower which has not been disclosed to Lender in writing which could reasonably be expected to have a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

4.1    <u>Payments and Performance</u>.  Borrower will duly and punctually pay and perform all Obligations on its part to be done or performed under the Transaction Documents.

4.2    <u>Books and Records: Inspection</u>.  Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied.  Borrower will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit inspection of the Collateral by Lender and/or Lender's representatives (a "<u>Field Inspection</u>").  Lender may, at its option and expense, require a Field Inspection not more than one (1) time in any calendar quarter, unless an Event of Default shall occur which has not been waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems reasonably necessary.  In the event that an infraction is found, all reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower, otherwise such costs shall be borne by Lender.  Borrower will from time to time furnish Lender with such information and statements as Lender may reasonably request with respect to the Obligations or Lender's security interest in the Collateral, and Borrower shall have a commercially reasonable time period to produce such information and statements.  Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.  Lender shall have the right to contact Borrower's accountant in connection with any questions resulting from an inspection or the delivery of financial reports.

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020
19514708.1
233953-10001

4.3     Financial Information. Borrower will furnish to Lender:

(a)     as soon as available to Borrower, but in any event within thirty (30) days after the close of each calendar month, a full and complete copy of financial statements, which shall include a balance sheet of Borrower, as at the end of such month, and statement of profit and loss of Borrower reflecting the results of its operations during such month, in substantially similar form as provided to other creditors of Borrower;

(b)     as soon as available to Borrower, a full and complete copy of the annual audited financial report prepared for Borrower;

(c)     on a weekly basis, financial reports that disclose the Collateral held by Borrower's subsidiaries and the debt held by those subsidiaries sufficient to monitor Borrower's compliance with Section 5.2 herein; and

(d)     promptly, from time to time, such other financial data and information about Borrower as Lender may reasonably request.

All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower.

4.4     Financial & Operational Performance.  Borrower shall only use the Collateral for the benefit of Borrower and to meet its obligations to Lender under this Agreement.

4.5     Conduct of Business.  Borrower will maintain its articles of organization and existence in good standing and materially comply with all laws and regulations of the Tribe and of any other governmental authority which may be applicable to it or to the Business.

4.6     Taxes.  Borrower will promptly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith or any outstanding tax liability of Lender incurred prior to the Effective Date.  Lender may, at its option, from time to time, discharge any taxes resulting in a lien or encumbrance on the Collateral, or other charges resulting in liens or encumbrances on any of the Collateral, and Borrower will pay to Lender on demand or Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.7     Notification of Default.  Within five (5) days of becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.8     Notification of Litigation.  Borrower will promptly notify Lender in writing of any litigation or of any investigative or enforcement actions initiated by a governmental agency or

-7-

authority against it which would or is reasonably be expected to have a Material Adverse Effect. The Parties agree this Section does not apply to correspondence or inquiries received in the ordinary course of business from various Tribal, federal or state agencies or departments. Without limiting the foregoing, within two (2) days of Borrower obtaining knowledge of the existence thereof, Borrower shall notify Lender of any applicable investigative or enforcement action, and shall immediately forward to Lender, on receipt thereof by Borrower, a copy of any written communication or correspondence concerning the foregoing.

4.9    Compliance.  Borrower shall comply with all applicable requirements of governmental authorities having jurisdiction over Borrower, including, without limitation, those relating to money laundering and terrorism, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

4.10    Organizational Documents.  Borrower shall comply in all respects with, and shall notify Lender of any changes to, Borrower's articles of organization and Borrower's operating agreement.

4.11    Location of Collateral.  Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof.

4.12    Notification of Material Adverse Effect.  Borrower will immediately notify Lender of any Material Adverse Effect.

4.13    Notification of Creation of Subsidiaries.  Borrower shall notify Lender of the creation of any subsidiary of Borrower within five (5) days of incorporation or registration.

4.14    Deposit Account Control Agreements.  Unless waived by Lender, the Borrower will enter into a deposit account control agreement (or maintain existing deposit account control agreements) for any bank account(s) in which the Borrower conducts its business or holds assets in a form mutually agreeable with Lender, so long as a deposit account control agreement is available from that bank. If Borrower enters into other banking arrangements, Borrower will enter into deposit account control agreements for any such bank accounts if a deposit account control agreement is available and, if a deposit account control agreement is not available then Borrower shall inform Lender of such new banking arrangement and shall only keep de minimis assets in any such accounts.

4.15    Title to Acquired Collateral.  As to Collateral that Borrower acquires, Borrower shall be the lawful owner of its assets constituting the Collateral. Subject to Section 3.3, the Collateral and each item thereof will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, senior to the security interest granted to Lender hereby. Subject to Section 3.3, Borrower has full power and authority to grant to Lender a security interest in the Collateral as it is acquired, and Borrower will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security

-8-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

interest in any of the Collateral (or any of Borrower's right, title or interest therein), to any person senior to the Lender. The Collateral will be valid and genuine in all respects.

4.16    Licensing and Tribal Law. Borrower shall maintain all licenses and other authorizations required by Tribal law for Borrower to operate the Business.

4.17    Existing Debt. As of the execution of this Agreement, Borrower does not owe any debts that are superior to the Obligations of Borrower to Lender and any indebtedness of Borrower is subordinate to the Obligations of Borrower to Lender.

## 5.    NEGATIVE COVENANTS

5.1    Additional Superior Indebtedness. Borrower shall not, without the prior written consent of Lender in each instance, issue any evidence of indebtedness that is superior to the Obligations of Borrower to Lender or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness that is superior to the Obligations of Borrower to Lender. For the avoidance of doubt, Borrower may only issue evidence of indebtedness that is subordinate to the Obligations of Borrower or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness that is subordinate to the Obligations of Borrower to Lender without Lender's consent.

5.2    Over-Collateralization of Subsidiaries. Borrower shall not over-collateralize Borrower's subsidiaries in any amount in excess of 10% of the amount required by PMOF or a similar credit facility. If Borrower over-collateralizes Borrower's subsidiaries, Borrower shall have a five (5) day period to cure any such over-collateralization.

5.3    Investments. Borrower shall not make investments in any individual, trust, entity or Tribal or governmental body, with the exception of capitalizing BPL-F1, Borrower's subsidiary, that as of the Effective Date is borrowing from PMOF Special Situations Private Credit Fund LLC, and while the debt owed to PMOF remains outstanding. Borrower will not purchase or otherwise invest in or hold securities, real estate or other non-operating assets unless approved by Lender in writing. Notwithstanding the foregoing, nothing in this Section 5.3 shall preclude Borrower from leasing at no more than arms-length, market rates, or improving office space, in the normal course of business.

5.4    Transfers. Borrower shall not cause any assets of Borrower to be sold, transferred, granted, or assigned to any other person or entity for less than reasonably equivalent value outside the ordinary course of business.

5.5    Other Business. Borrower shall not engage in any business other than the Business.

5.6    Confidentiality. All oral and written information about Borrower and the Lender, their respective businesses, members, successors, predecessors, subsidiaries, officers, managers, assigns, assignees and customers, now, heretofore or hereafter acquired or received, and all the Transaction Documents are valuable and proprietary assets. The Borrower and the Lender (and each of their respective employees and agents) shall treat such information as strictly confidential

-9-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

and, except as expressly authorized hereunder, will not disclose Records to any person or use Records other than in accordance therewith. Disclosure of Records that is compelled or requested by a tribunal, court, administrative body of competent jurisdiction, or other legal process shall not constitute a breach of this provision, provided the disclosing Party must promptly inform the other Party (a) of the existence, terms, and circumstances surrounding such request; (b) consult with the other Party on the advisability of taking available legal steps to resist or narrow such request; and (c) reasonably cooperate with the other Party to seek a protective order. Each Party will use its best efforts to ensure that its employees and agents maintain such confidentiality. This Section 5.3 will not apply to information, documents and material that are in or enter the public domain other than through a wrongful act or omission of a party.

## 6.    DEFAULT

6.1    Default. An "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)    (1) failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note, or, (2) any material breach or default by Borrower of an affirmative covenant hereof not substantially cured within thirty (30) days, or (3) any material breach or default by Borrower of a negative covenant hereof; or

(b)    if any statement, representation or warranty heretofore, now or hereafter made by Borrower in connection with this Agreement or in any supporting financial statement of Borrower shall be determined to have been intentionally false in any material respect when made; or

(c)    the liquidation, termination or dissolution of Borrower, or the merger or consolidation of Borrower into another entity that is not otherwise permitted hereby, or stops processing loans or servicing loans for ninety (90) days of any one hundred twenty (120) day period; or

(d)    the institution by the Borrower of any insolvency proceedings, whether under the United States Bankruptcy Code 11 USC §101 *et seq.* or any other law, in which Borrower is alleged to be insolvent or unable to pay its debts as they mature, or the making by Borrower of an assignment for the benefit of creditors or the granting by Borrower of a trust mortgage for the benefit of creditors and, if such proceeding is instituted against Borrower, such proceeding shall not have been dismissed in sixty (60) days; or

(e)    the service upon Lender of a writ in which Lender is named as trustee of Borrower; or

(f)    the occurrence of any Material Adverse Effect; or

(g)    any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any material portion of the property of Borrower, and such lien or levy shall not be removed within sixty (60) days.

19514708 1
233953-10001

6.2    Windup.

(a)    If an Event of Default under Section 6.1(d) shall have occurred, all Obligations shall become immediately due and payable without notice or demand. If any other Event of Default shall have occurred which, to the extent capable, has not been waived by Lender, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.

(b)    Lender is hereby authorized, at its election, after an Event of Default shall have occurred which has not been waived by Lender, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at a public or private sale; and Lender may also exercise any and all other rights and remedies of a secured party under the UCC or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower agrees that ten (10) days' written notice to Borrower or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. The net proceeds of sale shall belong to Lender. Upon demand by Lender, Borrower shall assemble the Collateral and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender and Borrower. Borrower hereby acknowledges that Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's granting Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default which has not been waived by Lender and Borrower hereby acknowledges that Lender is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to Lender.

(c)    Lender shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), the Obligations or to resort to such security in any particular order; and all of its rights hereunder and in respect of such securities and guarantees shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may,

-11-

Borrower hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so, Borrower hereby irrevocably waives the benefits of all such laws. Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

(d)     Borrower will accelerate all payments pursuant to Section 6.2(a), or other mutually agreeable methodology, and in good faith pursue winding up the business of the Borrower in a manner that maximizes the value to Lender.

(e)     In the event of assignment of Consumer Loans after an Event of Default, so long as it is commercially feasible, Lender, its successors or assigns agrees to:

    (i)     notify the Tribal Financial Services Regulatory Authority of the assignment of Collateral and provide contact information for the holder of the Collateral; and

    (ii)    notify Consumers of the assignment of the Consumer Loan.

6.3    Power of Attorney. Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of Lender, upon the occurrence of an Event of Default which has not been waived by Lender, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work -in process, and the sale (either public or private) of all or any portion or portions of the Collateral (subject to the notice and other terms provided in Section 6.2, above); to solely enforce collection of the Collateral either in its own name or in the name of Borrower beyond 90 days after the transfer of collateral, including, without limitation, executing releases or waivers, compromising or settling with any Consumers and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest; to notify applicable postal authorities to change the address for delivery of mail addressed to Borrower to such address as Lender shall designate; to endorse the name of Borrower in favor of Lender upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to act on behalf of Borrower under any vendor, including payment processors, or servicing contract beyond 90 days after the transfer of collateral to sign the name of Borrower on verification of the Collateral beyond 90 days after the transfer of collateral; and to sign, if necessary, and file or record on behalf of Borrower any financing or other statement in order to perfect or protect Lender's security interest. Unless otherwise provided in this Agreement, Lender shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do

-12-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be entitled to collect more than an amount equal to the then outstanding Obligations, and any sums received in excess of the then-outstanding Obligations shall be returned to Borrower unless otherwise provided in this Agreement, and it shall not be responsible to Borrower or to any other party except in the event that Lender has been determined, with finality, by an Arbitration Decision (as hereafter defined), that Lender has committed gross negligence or willful misconduct. All powers conferred upon Lender by this Agreement, being coupled with an interest, shall be, once triggered, irrevocable so long as any Obligation of Borrower or any surety to Lender shall remain unpaid or Lender is obligated under this Agreement to extend any credit to Borrower. This power of attorney shall not grant Lender with the right or ability to waive the sovereign immunity of the Tribe or Borrower.

6.4    Transferring Remaining Monies to Borrower. If an Event of Default under Section 6.1 has occurred for any of Borrower's subsidiaries, Borrower's subsidiary shall, after satisfying any and all obligations to PMOF or similar first lien-holder, remit all monies to Borrower.

6.5    Interest on Delinquent Payments. If an Event of Default under Section 6.1(a)(1) has occurred, Lender shall be entitled to interest on any past due payments, whether of principal or interest, at 18% APR.

6.6    Default Following Change to Organizational Documents or Tribal Law Restricting Lender's Rights. If an Event of Default under Section 6.1 has occurred that follows a change to Borrower's articles of organization or operating agreement, or a change in the laws and/or regulations of the Tribe, that affects any of Lender's rights and remedies under the Transaction Documents, the Event of Default, and Lender's rights and remedies under the Transaction Documents, shall be adjudged and/or determined according to Borrower's articles of organization or operating agreement, or laws and/or regulations of the Tribe, in effect as of the Effective Date. Any impediment to the Collateral that results from a change to the Borrower's articles of organization or operating agreement, or a change in the laws and/or regulations of the Tribe, may be remediated by an avoidance action.

6.7    Available Remedies Are Not Control. Consistent with the representations made in Section 7.13 herein, Borrower agrees that the remedies afforded by Sections 6.2 and 6.3 do not give Lender the right or power to exercise control over the day to day affairs or management of Borrower.

6.8    Nonexclusive Remedies. All of Lender's rights and remedies not only under the provisions of this Agreement but also any other Transaction Document shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

6.9    Force Majeure. In the event of an act of God or other natural disaster or national pandemic which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in applicable federal law applicable to Borrower's Business or to either Party, or upon a final federal agency determination that is not appealable or a final resolution, through appeal, by a court of competent jurisdiction that the performance of a Party's obligations under this Agreement is unlawful and after the Parties

-13-

have negotiated in an attempt to agree upon new terms for the Transaction Documents to comply with the determination, then the Party unable to perform, or whose performance has been rendered illegal by a federal governmental authority, may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination to the other Party, unless such changes in federal law or determination by a federal governmental authority requires earlier termination, in which case termination shall be effective upon such earlier required date.

## 7.    MISCELLANEOUS

7.1    <u>Waivers</u>.  Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2    <u>Severability</u>.  If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstance shall not be affected thereby.

7.3    <u>Set-Off</u>.  Borrower hereby grants to Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from Lender to Borrower and any cash, securities, instruments or other property of Borrower in the possession of Lender whether for safekeeping or otherwise, or in transit to or from Lender as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to Lender as are then due and unpaid, whether or not demand has been made and whether or not other collateral is then available to Lender.

7.4    <u>Costs and Expenses</u>. Borrower shall pay to Lender any and all costs and expenses (including, without limitation, reasonable attorneys' fees, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.5    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.  Delivery by any Party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.6    <u>Complete Agreement</u>.  This Agreement and the other Transaction Documents constitute the entire agreement and understanding between and among the Parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

7.7     Binding Effect of Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all commitments of Lender hereunder are terminated and all Obligations hereunder are fully paid.  Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights and liabilities of Lender; and such assigning Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement, and the Collateral.  The Parties may not assign or transfer their rights or obligations under this Note without first obtaining the prior written consent of the other party. A request to obtain consent to assign shall be provided by the assigning party at least sixty (60) days in advance of the intended assignment date.  Except as expressly provided in the other Transaction Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Transaction Documents.

7.8     Further Assurances.  Borrower will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Transaction Documents or to vest more fully in or assure to Lender the security interest in the Collateral granted to Lender by this Agreement or to comply with applicable Michigan or federal law and to facilitate the collection of the Collateral (including, without limitation, the endorsement of promissory notes and instruments and notifications to obligors on the Collateral).  To the extent permitted by applicable Michigan, Tribal, or federal law, Borrower authorizes Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be signed by Lender on behalf of Borrower, if necessary, and may be filed at any time in any jurisdiction.  Lender may at any time and from time to time file financing statements, continuation statements, debentures, mortgage, and any other documents allowed under the laws of the Tribe or any other applicable jurisdiction, and amendments thereto which contain any information required by the laws of the Tribe or any other applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower.  Borrower agrees to furnish any such information to Lender promptly upon request.  In addition, Borrower shall at any time and from time to time take such steps as Lender may reasonably request for Lender (a) to obtain an acknowledgement, in form and substance reasonably satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (b) to obtain possession and control of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (c) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein.  Lender shall deliver to Borrower a copy, on receipt by Lender from the applicable filing jurisdiction, of any such financing statements.

7.9     Amendments and Waivers.  This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties.  No delay or omission

-15-
Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right, and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

7.10    Terms of Agreement.  This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or Lender shall have any obligation to extend any financial accommodation hereunder, and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower under the Transaction Documents, nor shall any contemporaneous or subsequent agreement between Borrower and Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.11    Notices.  Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record.  Any such notice shall be deemed duly received and effective (a) if delivered in hand or by telecopier to, or received by, any officer or agent of Borrower or Lender, upon such delivery or receipt, or (b) if sent by overnight courier, on the next business day after being so sent, (c) if sent via electronic medium and reply or other proof of receipt is available, or (d) if mailed by registered or certified mail, return receipt requested, postage prepaid, and properly addressed to Borrower or Lender, two (2) business days after being so mailed.  A party's proper address is that set forth for such party in this Agreement or such address as that party may from time to time hereafter designate by notice to the other party.

> If to Lender:       Eventide Credit Acquisitions, LLC
> Attn: Matt Martorello
> 1920 McKinney Ave., 7th Floor
> Dallas, Texas 75201
>
> With a copy to counsel:
>
> Loeb & Loeb LLP
> 10100 Santa Monica Blvd., Suite 2200
> Los Angeles, CA 90067
>
> If to Borrower      Big Picture Loans, LLC
> Attn: Co-Managers
> E23970 Pow Wow Trail
> P.O. Box 704
> Watersmeet, Michigan 49969
>
> Tribal Economic Development, LLC as sole member of
> Big Picture Loans, LLC Attn: General Counsel
> P.O. Box 704

-16-
Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

Watersmeet, Michigan 49969

With copy to counsel:

Rosette, LLP
44 Grandville Ave. SW
Suite 300
Grand Rapids, MI 49503

7.12   Reproductions.  This Agreement and all documents which have been or may be hereinafter furnished by one Party to the other Party may be reproduced by either Party by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding allowable pursuant to Section 8.5 herein (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.13   No Partnership.  Nothing contained in this Agreement or the other Transaction Documents shall be deemed to create an equity investment in Borrower on the part of Lender or a partnership between Lender and Borrower, it being the intent of the parties hereto that only the relationship of lender and borrower shall exist with respect to the Loan.  Borrower agrees that it shall report this transaction for income tax purposes, and file all applicable and related tax returns, in a manner consistent with the form of this transaction as a loan.

7.14   Lender Is Not In Control: Lender-Creditor Relationship.

(a)   None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the day to day affairs or management of Borrower, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

(b)   The relationship between Lender, on the one hand, and Borrower, on the other hand, is solely that of creditor and debtor.  Lender shall not have (or be deemed to have) any fiduciary relationship or duty to Borrower, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower on the other hand, by virtue of, the Transaction Documents.

7.15   Certification.  The individual(s) signing this Agreement on behalf of each Party, by affixing a signature(s) hereon, hereby certify(ies) for the benefit of the receiving Party, that all information submitted to the receiving Party in connection with this Agreement is true and correct in all material respects on and as of the Effective Date.

## 8.   TRIBAL WAIVER OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1   Limited Waiver Of Sovereign Immunity.

-17-

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

(a)  Retention of Sovereign Immunity. By executing this Agreement, Borrower does not waive, limit or modify its sovereign immunity, except as expressly provided in this Section 8.

(b)  Scope of Waiver. Subject to the provisions of this Section 8, Borrower hereby expressly and irrevocably grants to Lender a limited waiver of its sovereign immunity from suit and consents to suit in accordance with this Section. This waiver applies to actions in which Lender alleges a default or breach by Borrower of one or more of the specific obligations or duties expressly assumed by Borrower under the terms of this Agreement and the Transaction Documents. These waivers expressly include Lender's ability to pursue in litigation:

    (i)  Specific performance or other specific action, or discontinuance of some action, by Borrower only to remedy an alleged breach and bring Borrower into full compliance with its duties and obligations hereunder; or

    (ii)  Injunctive relief and/or avoidance actions against Borrower to remedy actions or conduct which causes any terms of the Transaction Documents to be breached; or

    (iii)  Money damages for noncompliance with the terms and provisions of the Transaction Documents; or

    (iv)  Borrower does not consent to a waiver of its sovereign immunity from suit except for the limited purposes as set forth in this Section 8 and as follows: (A) the dispute shall be brought by and limited to Lender and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited to the assets and revenues of Borrower and no other assets of the Tribe or Tribal instrumentalities.

(c)  Express Forum Waiver. Borrower hereby expressly and irrevocably waives:

    (i)  its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

    (ii)  any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Lender does not consent to the jurisdiction of any Tribal Forum;

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020

(iii) any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv) its sovereign immunity as to an action by Lender in the United States District Court for the Western District of Michigan, and in the federal courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Borrower based solely upon an attempt by Borrower to revoke its waiver of its sovereign immunity or other waivers granted under this Section 8, or solely to compel participation in arbitration proceedings pursuant to Section 8.5, or to enforce an arbitration decision or seek injunctive relief or an avoidance action against Borrower, or solely to seek fast-track injunctive relief pursuant to 8.5(e);

(v) its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Section 8, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi) its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Borrower in this Section 8).

8.2 <u>Consent to Jurisdiction</u>. Borrower consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan and any federal court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Section 8. This limited waiver of sovereign immunity does not allow any other suit in any other forum for any other purpose other than what is described herein. It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to binding arbitration, and then to the federal and state courts specified herein.

8.3 <u>Enforcement Authorization of Governmental Authorities</u>. Without in any way limiting the generality of the foregoing, Borrower expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Borrower's, to give effect to any judgment or order entered, subject to this Section 8 and in accordance with applicable law.

8.4 <u>Governing Law</u>. This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5 <u>Dispute Resolution</u>. In the event that either Party to this Agreement believes that the other Party has failed to comply with any requirement of this Agreement or a Transaction

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020
19514708.1
233953-10001

Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a)     Discussions between the Parties. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet within a reasonable time or to resolve the dispute and shall invoke Section (b) below.

(b)     Binding Arbitration. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "AAA"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select two (2) arbitrators from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years' experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "Arbitration Decision") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c)     Good Faith. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate

-20-

sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration.

(d)   Enforcement of Arbitration Decision.  Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Section 8 solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided and shall be complied with by the Parties. In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e)   Fast-track Injunctive Relief.

(i)   Except as limited by Section 8.5(e)(ii), either Party may bring an original action in a court of competent jurisdiction pursuant to this Section 8 to prevent actions by the other Party which could have a Material Adverse Effect if taken. Borrower may also, upon Lender taking action(s) pursuant to Section 6.3 as Borrower's true and lawful attorney-in-fact, bring an original action in a court of competent jurisdiction pursuant to this Section 8 to challenge the validity of such actions. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this section 8.5.  For the avoidance of doubt, maintaining the status quo shall include ensuring that each Party is acting in compliance with their obligations under the Transaction Documents.

(ii)   Pursuant to Section 6.2(b) of the Agreement, upon the occurrence of an Event of Default, which has not been waived by the Lender, Lender may bring an original action in a court of competent jurisdiction pursuant to this Section 8 to obtain injunctive relief. Borrower may not bring an original action pursuant to Section 8.5(e)(i) to preempt or in response to any such action.

8.6   Attorneys Fees.  Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7   Service of Process.  Borrower and Lender hereby consent to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020
19514708 1
233953-10001

    8.8   <u>JURY WAIVER</u>.   **BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

    8.9   <u>Irrevocable Waiver</u>.  Borrower covenants and agrees that it possesses the requisite authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Section 8 and that each are irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral or for that period of time required to resolve any disputes initiated within the times set forth previously,  whichever is longer.  The Borrower agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Section 8.

Eventide Credit Acquisitions, LLC Loan and Security Agreement – September 18, 2020
19514708.1
233953-10001

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the date first above written.

**LENDER:**

**Eventide Credit Acquisitions, LLC**

By: _____

Name:  Matt Martorello

Its:  Manager

**BORROWER:**

**Big Picture Loans, LLC**

By: _____

Name:  Michelle Hazen

Its:  Co-Manager and CEO

Signature Page

## EXHIBIT A

*Renee Galloway, et al v. James Williams, Jr., et al*., Case No. 3:19-cv-470
*Ebony McNichols vs. Big Picture Loans, LLC, et al*., Ref. No. 19-004069-SC

# EXHIBIT "C"

# ROSETTE, LLP

## ATTORNEYS AT LAW

44 CESAR E. CHAVEZ AVENUE SW, SUITE 250, GRAND RAPIDS, MI. 49503
TELEPHONE: 616-655-1601 • FAX: 517-913-6443
www.rosettelaw.com

August 3, 2023

Eventide Credit Acquisitions, LLC
Attn: Matt Martorello
1920 McKinney Ave., 7th Floor
Dallas, TX 75201

*Sent via email to: joe@bdlawpllc.com; bgiven@loeb.com*

        Re:     Notice of Termination

Dear Mr. Martorello,

        Please consider this notice of termination of the September 18, 2020, Loan and Security Agreement ("LSA") and the Secured Promissory Note ("Note") between Eventide Credit Acquisitions, LLC ("Eventide") and Big Picture Loans, LLC ("Big Picture").

        At Section 6.9, the LSA contains a Force Majeure clause, which states, in part:

> if a Party's performance hereunder is rendered illegal . . . or whose performance has been rendered illegal by a federal government authority . . . then the Party unable to perform, or whose performance has been rendered illegal . . . may terminate this agreement by giving written notice at least ninety (90) calendar day s in advance of termination . . . unless such . . . determination by a federal governmental authority requires earlier termination, in which case termination shall be effective upon such earlier required date.

        As you know, on June 30, 2023, in *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-00461 (E.D. Va), ***you did not oppose entry of a judgment against*** you as to Plaintiffs' claims that you violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1962(d).  And on that same day, you ***stipulated*** to your participation in the operation of a RICO enterprise in violation of RICO 18 USC § 1962(c).

        As a consequence of your actions, on July 7, 2023, the Court issued an Order that judgment will be held against you for violating RICO, 18 USC § 1962(d), for $43,401,817.47, and another order finding that, based on your stipulation, judgment shall be issued against you for violating RICO, 18 USC § 1962(c).

        Your confessions to violating RICO have rendered the LSA an illegal contract.  Put differently, the only way you are connected to a RICO enterprise is by way of your ownership and management of Eventide and its relationship via the LSA and through your receipt of

Eventide Credit Acquisitions, LLC
Page 2
August 3, 2023

payments under the LSA.  Accordingly, Big Picture cannot make loan payments without (innocuously) furthering your illegal conduct.  "No one is required to comply with an illegal contract, and no one receives damages based on a breach of an unenforceable obligation."  *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. CV 2020-0310-JTL, 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020), judgment entered, (Del. Ch. 2021), and aff'd, 268 A.3d 198 (Del. 2021).

Additionally, your own legal counsel has claimed that because of your illegal conduct, the Collateral is no longer valid and genuine, and that Big Picture is not in compliance with all applicable laws.  (See July 17, 2023 Letter from J. Brophy to K. Wichtman, p. 3.)  Your counsel has also suggested that Big Picture is incapable of carrying on its business and is unable to cure these issues (*id*. at pp. 3-4), which impedes Big Picture's ability to perform under the LSA in several ways.  Assuming *arguendo* that your counsel is correct, Big Picture is unable to perform under the LSA as a direct result of your admitted illegal conduct and may terminate the LSA and Note.

Under the notice provision in the LSA, the LSA and Note will be terminated in 90 days, on November 1, 2023, unless a final judgment issues sooner, which will cause immediate termination.  Pending termination, Big Picture will cease all loan payments to you, but escrow the funds in anticipation of your dispute over the applicability of the Force Majeure clause.

While we are very disappointed to learn that you misled the Tribe and Big Picture to run a RICO enterprise, as to your stipulation and the subsequent orders, they are what they are and do indeed foreclose Big Picture's ability to perform under the LSA.  As such, we have no choice but to move forward with termination.

Sincerely,

Tanya Gibbs, Partner

cc:    Loeb & Loeb LLP
       Attn: Barney Given
       10100 Santa Monica Blvd., Suite 2200
       Los Angles, CA 90067

       Brophy & Devaney, PLLC
       Attn: Joseph F. Brophy
       317 Grace Lanne, Suite 210
       Austin, TX 787446

# EXHIBIT "D"



Jeff P. Prostok*
Direct Dial No. (817) 877-4223
E-mail: jprostok@forsheyprostok.com
Fort Worth Office

*Board Certified Business Bankruptcy
Texas Board of Legal Specialization

September 6, 2023

*Via Email:* tgibbs@rosettelaw.com
*Via Email:* jgray@rosettelaw.com
*Via Facsimile:* (517) 913-6443
*Via Federal Express, Overnight Delivery*
Tanya Gibbs
Justin Gray
Cesar E. Chavez Avenue SW, Suite 250
Grand Rapids, MI  49503

*Via USPS Priority Mail, Overnight Delivery:*
TED, Big Picture Loans and Ascension
Attn:  Karrie S. Wichtman, General Counsel and Co-Managers
E23970 Pow Wow Trail
P.O. Box 704
Watersmeet, Michigan 49969

*Via USPS Priority Mail, Overnight Delivery:*
Lac Vieux Desert Band of Lake Superior
Chippewa Indians
N4698 US Hwy 45
Watersmeet, Michigan 49969

Re:     *In re Eventide Credit Acquisitions, LLC,* Case No. 23-90007-mxm11, pending
        in the United States Bankruptcy Court, Northern District of Texas
        **NOTICE OF DEFAULT UNDER LOAN AND SECURITY AGREEMENT**
        **NOTICE OF CHAPTER 11 BANKRUPTCY CASE**

Dear Counsel, Co-Managers, and Tribal Representatives:

I am writing to you on behalf of my client, Eventide Credit Acquisitions, LLC's
("**Eventide**," "**Lender**," or "**Debtor**") claim for default of that certain Loan and Security
Agreement dated on or about September 18, 2020 ("**LSA**") between Eventide and Big
Picture Loans, LLC ("**Borrower**" or "**Big Picture**"), a wholly owned subsidiary of Tribal
Economic Development Holdings, LLC "**TED**"), a wholly owned and operated economic arm
and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the
"**Tribe**" or "**LVD**").

**NOTICE OF DEFAULT UNDER NOTE AND LOAN AND SECURITY AGREEMENT**

On September 1, 2023, Borrower failed to make the payment to Eventide in the
principal amount of $175,000 as required pursuant to the terms of the LSA and Secured
Promissory Note dated September 18, 2020 (the "**Note**").  Section 6.1(a)(1) of the LSA

September 5, 2023
Page 2

defines an "**Event of Default**" as "failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note." The date that is three (3) days from the date of the payment due date was September 4, 2023. As of today, September 5, 2023, which date is more than three (3) days after the due date, the required payment has not been received. Consequently, an Event of Default (the "**Payment Default**") under the Note and section 6.1(a)(1) of the LSA has occurred. The LSA and Note do not provide for any right to cure an Event of Default that results from a Payment Default.

I have received a copy of the purported Notice of Termination dated August 3, 2023 sent by Borrower to Eventide (the "**August 3 Letter**") in which Borrower declared the occurrence of an alleged *force majeure* event under section 6.9 of the LSA and indicated an intention to escrow funds pending resolution of any dispute regarding whether a *force majeure* event had occurred.

Eventide disputes Borrower's contention that a *force majeure* event has occurred. Indeed, there has never been an adjudication (let alone any finding) by a court of competent jurisdiction that <u>Borrower's performance under the LSA</u>, which is subject to Delaware law, is unlawful. In addition, as you were made aware in Eventide's August 4th response to your August 3 Letter, neither the Note nor the LSA authorizes Borrower to escrow funds in place of making the payments required under the Note and LSA. Consequently, based on Borrower's Payment Default, an uncurable Event of Default under the Note and LSA has occurred.

Based on the Payment Default, under section 6.2(a) of the LSA, based on Eventide's election, "**all Obligations [under the Note and LSA] shall become immediately due and payable without notice or demand**." Eventide has not waived Borrower's Payment Default and, under section 6.2(a), elects that all Obligations under the Note and LSA are now immediately due and payable.

In addition, in accordance with section 6.2(d) of the LSA, Borrower must "**accelerate all payments … and in good faith pursue winding up the business of the Borrower in a manner that maximizes value to Eventide**." In this regard, Section 2.3 of the LSA provides:

> [F]ollowing an Event of Default or at maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower with reference to the Collateral. ***All proceeds of and collection of Collateral shall be for the purpose of and satisfying the Note and making disbursements thereunder.*** From and after an Event of Default which has not been waived by Lender, ***"all proceeds of and collections from the Collateral shall be held in trust by Borrower for the benefit of Lender;*** and, from and after an Event of Default which has not been waived by Lender, ***Borrower agrees to deliver to Lender on the dates of receipt thereof by Borrower, duly endorsed to Lender or to bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.***

September 5, 2023
Page 3

LSA, Section 2.3 (emphasis added).  Based on the foregoing, Borrower shall immediately turn over all cash and related current assets/reserves (which appear to be approximately $5.6 million) and wire such funds to Eventide's account by end of this week.  In addition, Borrower shall make ongoing daily wires to Eventide as Big Picture unwinds its business as required under section 6.2(d) of the LSA.

In the event Big Picture does not immediately comply with its requirements under the LSA, including by transferring all cash and related reserves/assets to Eventide immediately and begin making ongoing daily wires as required under sections 2.3 and 6.2(d) of the LSA, Eventide reserves its right to, among other things, exercise its rights under the power of attorney granted by Big Picture to Eventide under section 6.3 of the LSA.

In addition to being a breach of the terms of the Note and LSA, any action by Borrower, TED, LVD or other LVD entity to interfere with Eventide's Collateral or its rights and remedies under the Note and LSA will constitute a willful violation of the automatic stay under section 362 of the Bankruptcy Code, as discussed below.

**NOTICE OF EVENTIDE'S CHAPTER 11 BANKRUPTCY FILING**

Please be advised that today, September 6, 2023, at 12:54 p.m., Eventide filed a petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"). A copy of the Notice of Bankruptcy Case Filing is enclosed with this letter as **Exhibit A** for your reference. This firm represents Eventide in its chapter 11 case.

As you may be aware, the commencement of a bankruptcy case creates an automatic stay of, among other things, "*any act* to obtain possession of property of the estate or of property from the estate or *to exercise control over property of the estate*." 11 U.S.C. § 362(a)(3) (emphasis added). A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Given that Eventide has accelerated all Obligations, and all proceeds and collections of the Collateral are now being held in trust by Big Picture, for the benefit of the Debtor and its bankruptcy estate.

Eventide is concerned that Big Picture has taken or may take actions that violate Eventide's property rights in contravention of the automatic stay, in at least two ways.

First, any attempt by Big Picture to terminate the LSA and Note on November 1, 2023, as suggested in the August 3 Letter, would violate the automatic stay. Property of the estate includes the debtor's interests in contracts. Any effort to terminate or otherwise interfere with a debtor's existing contract rights constitutes an "act . . . to exercise control over property of the estate" and is therefore prohibited by the automatic stay. *Factory Sales & Eng'g, Inc. v. Electrica Nueva Energia S.A. (In re Factory Sales & Eng'g, Inc.),* 2017 Bankr. LEXIS 3538, *7-*8, *10 (Bankr. E.D. La. Oct. 12, 2017).

**Please be advised that any effort by Big Picture, from and after the commencement of Eventide's chapter 11 case, to terminate the LSA or the Note or otherwise to interfere with Eventide's rights under the LSA or the Note, including its rights to the Collateral, will constitute a willful violation of the automatic stay.**

September 5, 2023
Page 4

Second, Big Picture's proposed use of Eventide's Collateral in settlement of the *Hall* or *Gernenz* class actions (or any other matters) would constitute an unlawful attempt to exercise control over property of Eventide's bankruptcy estate (i.e., the Collateral). The LSA grants to Eventide a security interest in substantially all of Big Picture's financial assets (among other assets), including money and proceeds of such assets; consequently, Eventide holds a valid, perfected, and enforceable first-priority lien on all cash and assets in the possession of Big Picture. (see LSA sections 2.1 and 2.2(b)(i)).

As indicated above, based on Big Picture's Payment Default, "[a]ll proceeds of and collections from the Collateral are now to be held in trust by [Big Picture] for the benefit of [Eventide] and delivered to [Eventide], on the dates of receipt thereof, all proceeds of the Collateral." Consequently, any use of Eventide's Collateral without Eventide's permission—including, but not limited to, for use in settlement of the *Hall* or *Gernenz* class actions or any other matter—would violate the automatic stay.

I am sure you understand the seriousness of this matter and Eventide's need to move aggressively to protect its rights. The Note and LSA are Eventide's primary revenue generating assets, and Eventide must do everything it can to safeguard these assets for the benefit of its creditors. **Please be advised that Eventide reserves the right to seek appropriate relief against Big Picture in the Bankruptcy Court to protect Eventide's rights under the Bankruptcy Code. Such relief may include punitive damages for willful violation of the automatic stay.**

On a related matter, you are probably aware that the Supreme Court has recently held that the Bankruptcy Code abrogates the sovereign immunity of federally recognized Indian tribes and arms thereof, eliminating any doubt that the automatic stay is fully applicable to such parties to the same extent as to any other party. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1698-99 (2023).

Thank you for your attention to this matter. I trust we can count on your and your client's assistance and full cooperation. Please contact me if you have questions about any of the foregoing.

Sincerely,

Jeff Prostok

cc:  Suki Rosen (srosen@forsheyprostok.com)

# EXHIBIT "A"

United States Bankruptcy Court

Northern District of Texas

## Notice of Bankruptcy Case Filing

A bankruptcy case concerning the debtor(s) listed below was
filed under Chapter 11 of the United States Bankruptcy Code,
entered on 09/06/2023 at 12:54 PM and filed on 09/06/2023.

**Eventide Credit Acquisitions, LLC**
3805 Greenbrier Drive
Dallas, TX 75225
Tax ID / EIN: 47-3061353



FILED
09/06/2023
12:54 PM

The case was filed by the debtor's attorney:

**Jeff P. Prostok**
Forshey & Prostok, LLP
777 Main St., Suite 1550
Ft. Worth, TX 76102
817-877-8855

The case was assigned case number 23-90007-mxm11 to Judge Mark X. Mullin.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against
the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at
all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take
other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights
in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our
*Internet* home page www.txnb.uscourts.gov or at the Clerk's Office, , .

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth
important deadlines.

Robert P. Colwell
Clerk, U.S. Bankruptcy Court

| PACER Service Center |
| :---: |
| **Transaction Receipt** |
| 09/06/2023 13:08:29 |

| PACER Login: | anne3506r | Client Code: | 6075 |
|---|---|---|---|
| Description: | Notice of Filing | Search Criteria: | 23-90007-mxm11 |
| Billable Pages: | 1 | Cost: | 0.10 |

# EXHIBIT "E"



Jeff P. Prostok*
Direct Dial No. (817) 877-4223
E-mail: jprostok@forsheyprostok.com
Fort Worth Office

*Board Certified Business Bankruptcy
Texas Board of Legal Specialization

September 15, 2023

*Via Email:*  **toby.gerber@nortonrosefulbright.com**
*Via Federal Express, Overnight Delivery*
Toby Gerber
Norton Rose Fulbright US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201

*Via Email:* **tgibbs@rosettelaw.com**
*Via Email:* **jgray@rosettelaw.com**
*Via Federal Express, Overnight Delivery*
Tanya Gibbs
Justin Gray
Rosette LLP
44 Cesar E. Chavez Avenue SW, Suite 250
Grand Rapids, MI  49503

*Via USPS Priority Mail, Overnight Delivery:*
TED, Big Picture Loans and Ascension
Attn:  Karrie S. Wichtman, General Counsel and Co-Managers
E23970 Pow Wow Trail
P.O. Box 704
Watersmeet, Michigan 49969

*Via USPS Priority Mail, Overnight Delivery:*
Lac Vieux Desert Band of Lake Superior
Chippewa Indians
N4698 US Hwy 45
Watersmeet, Michigan 49969

Re:    *In re Eventide Credit Acquisitions, LLC,* Case No. 23-90007-mxm11,
       <u>pending in the United States Bankruptcy Court, Northern District of Texas</u>
       **DEMAND FOR INFORMATION AND/OR FIELD INSPECTION UNDER
       SECTION 4.2 OF LOAN AND SECURITY AGREEMENT**

Dear Counsel, Co-Managers, and Tribal Representatives:

I am writing to you on behalf of my client, Eventide Credit Acquisitions, LLC
("**Eventide,**" "**Lender,**" or "**Debtor**"), as debtor and debtor-in-possession in Case No. 23-
90007-mxm11 (the "<u>Bankruptcy Case</u>"), pending in the United States Bankruptcy Court for

---

**FORSHEY PROSTOK**, LLP

500 Crescent Court, Suite 240          777 Main Street, Suite 1550          1990 Post Oak Blvd., Suite 2400
Dallas, Texas 75201                    Fort Worth, Texas 76102              Houston, Texas 77056
Ph 214-716-2100                        Ph 817-877-8855                      Ph 832-536-6910
Fax 817-877-4151                       Fax 817-877-4151                     Fax 832-310-1172

September 15, 2023
Page 2

the Northern District of Texas (the "<u>Bankruptcy Court</u>").  This demand letter concerns the Debtor's rights under that certain Loan and Security Agreement dated on or about September 18, 2020 ("**LSA**") between Eventide and Big Picture Loans, LLC ("**Borrower**" or "**Big Picture**"), a wholly owned subsidiary of Tribal Economic Development Holdings, LLC "**TED**"), a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "**Tribe**" or "**LVD**").

**DEMAND FOR INFORMATION AND/OR FIELD INSPECTION**

By letter dated September 6, 2023, we provided Big Picture with notice that an Event of Default had occurred under the terms of the LSA and Secured Promissory Note dated September 18, 2020, based on Big Picture's failure to make the payment due on September 1, 2023.  Such letter also provided notice of the filing of the Debtor's Bankruptcy Case.

To comply with its duties as a debtor-in-possession in the Bankruptcy Case, the Debtor needs information from Big Picture regarding the loans made between September 6, 2019 and September 5, 2023 (the "**Timeframe**").  In this regard, Section 4.2 of the LSA provides as follows:

> 4.2    <u>Books and Records: Inspection</u>. Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied. ***Borrower will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit inspection of the Collateral by Lender and/or Lender1s representatives (a "<u>Field Inspection</u>").*** Lender may, at its option and expense, require a Field Inspection not more than one (I) time in any calendar quarter, ***unless an Event of Default shall occur which has not been waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems reasonably necessary.*** In the event that an infraction is found, all reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower, otherwise such costs shall be borne by Lender. ***Borrower will from time to time furnish Lender with such information and statements as Lender may reasonably request with respect to the Obligations or Lender's security interest in the Collateral, and Borrower shall have a commercially reasonable time period to produce such information and statements.*** Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.

September 15, 2023
Page 3

     Lender shall have the right to contact Borrower's accountant in connection with any questions resulting from an inspection or the delivery of financial reports.

See LSA, Section 4.2 (emphasis added).

  By this letter, the Debtor demands that Big Picture provide the Debtor with information pertaining to the borrowers (the "<u>Borrowers</u>") who obtained loans from Big Picture during the Timeframe.  Specifically, for each Borrower and loan made during the Timeframe, the Debtor requests the following information (the "**Requested Information**"):

    (i)  Each Borrower's full name and address;

    (ii)  Each Borrower's email address;

    (iii)  Each Borrower's loan date;

    (iv)  Each Borrower's loan amount; and

    (v)  The date and amount of each Borrower's payment(s) on the loans.

The Requested Information is needed by the Debtor so that it can give notice to all parties who may assert claims against the Debtor.  Although the Debtor strenuously disputes that such parties hold valid claims, it nevertheless is required to give notice of the Bankruptcy Case and deadline for filing proofs of claim (the "**Claims Bar Date**") to holders of known disputed claims.

  The Debtor believes that the Requested Information is maintained by Big Picture in electronic format, which is readily accessible by Big Picture, such that producing the Requested Information will not be onerous.  Consequently, the Debtor demands that the Requested Information be provided to the Debtor in usable electronic format ***by no later than September 29, 2023*** (the "**Production Deadline")**, which is two (2) weeks from the date hereof.  The Debtor needs the Requested Information by the Production Deadline so that it can promptly give notice to potential claimants regarding the Claims Bar Date in the Bankruptcy Case.

  If Big Picture will not provide the Requested Information to the Debtor by the Production Date, then the Debtor hereby demands a Field Inspection, with full access to Big Picture's electronic files, on the Production Deadline, a date mutually agreed to between the parties, and/or a date ordered by the Bankruptcy Court, and continuing access on a day-to-day basis thereafter so that the Debtor can send designated persons to Big Picture's location to collect the Requested Information from Big Picture's servers.  Pursuant to Section 4.2 of the LSA, because an Event of Default has occurred, the Debtor is entitled to conduct Field Inspections "as frequently as the Lender deems reasonably necessary."  Alternatively, if Big Picture would prefer, we will make arrangements to obtain this information either remotely or from one of Big Picture's service providers which, on information and belief, also have electronic access to the Requested Information.

  Please let us know at your earliest convenience whether Big Picture plans to voluntarily provide the Requested Information to the Debtor by the Production Deadline.  If Big Picture will not voluntarily provide the information, then the Debtor will need to seek

September 15, 2023
Page 4

emergency relief from the Bankruptcy Court authorizing it to retain a company to either come to the reservation to perform the Field Inspection and/or work with one of Big Picture's service providers to obtain the Requested Information.  As a result, please let us know on or before **September 20, 2023** whether or not Big Picture plans to electronically provide the Requested Information by the Production Deadline.  If we do not receive any response from Big Picture by that time, we will proceed with seeking emergency relief from the Bankruptcy Court authorizing the Debtor to retain an appropriate company to come and retrieve the Requested Information from Big Picture's electronic servers and/or from one of Big Picture's third party service providers.

If a Field Inspection is required, we will also need to coordinate with you regarding the logistics of sending a company to the reservation, including information regarding where the Requested Information is kept, the format in which it is maintained, the name of a contact person who can provide access to Big Picture's electronic records, etc. Alternatively, as referenced above, we can also make arrangements to obtain this information either remotely and/or from one of Big Picture's third party service providers.  Let me know if there is a convenient time to discuss these details and how Big Picture would like to proceed.

Thank you in advance for your attention to this matter. I trust we can count on your and your client's assistance and full cooperation. Please contact me if you have questions about any of the foregoing.

Sincerely,

Jeff Prostok

cc:      Suki Rosen